## 30448, 30449, 30450.  W. T. RAWLEIGH COMPANY v. OVERSTREET et al.; and vice versa.

874

DECIDED DECEMBER 1, 1944. REHEARING DENIED DECEMBER 13, 1944.

879

W. T. Revell, for plaintiff.

M. C. Barwick, Frank Hardeman, for defendants.

MacIntyre, J. ■ In their cross-bills the defendants contend: (a) That they are not sureties as contended by the plaintiff, but are guarantors. "A surety binds himself to perform if the principal does not, without regard to his ability to do so. His contract is equally absolute with that of his principal. They may be sued in the same action, and judgment may be entered up against both. A guarantor, on the other hand, does not contract that the principal will pay, but simply that he is able to do so; in other words, a guarantor warrants nothing but the solvency of the principal." *Manry* v. *Waxelbaum Co.*, supra. If J. W. Overstreet and W. T. J. Davis, the defendants in the court below and the defendants in error in this court, joined in the same promise to pay, and bound themselves with their principal as original promisors, they are debtors from the beginning, are primarily liable, and are sureties. *Hartsfield Company* v. *Robertson*, 48 *Ga. App.* 735 (173 S. E. 201). On the other hand, if they made a separate and individual promise, entirely collateral to the original contract, not imposing any primary liability on them, they are secondarily liable and are guarantors. Section 103-101 of the Code states: "The contract of suretyship is one whereby a person obligates himself to pay the debt of another in consideration of credit or indulgence, or other benefit given to his principal, the principal remaining bound therefor. It differs from a guaranty in this, that the consideration of the latter is a benefit flowing to the guarantor."[1] Thus pointing out one difference between contracts of suretyship and contracts of guaranty. *Manry* v. *Waxelbaum Co.*, supra. "No particular or formal phrase is required to create a contract of suretyship.

Courts may disregard formal expressions, to ascertain the real intent of the parties, and the form of the contract is immaterial, provided the fact of suretyship exists. Code, § 103-104. The mere use of the word 'guarantee' will not make a contract one of guaranty." *Fields* v. *Willis,* 123 *Ga.* 272, 275 (51 S. E. 280). There is nothing in the instant case, in either the contract or the petition, that indicated that there was any consideration flowing to Overstreet, Cato, and Davis. On the contrary, we think that the pleading, with the contract attached as an exhibit, shows that their undertaking was the evident inducement to the plaintiff, the seller, to enter into the contract with Williams, the principal and buyer. No consideration other than the binding effect of the executory contract between the plaintiff in error and Williams, the principal, which induced Overstreet, Cato, and Davis to sign, is even suggested by the contract. No independent consideration flowed to Overstreet, Cato, and Davis, but the consideration of their contract was the engagement between the plaintiff in error and Williams, the principal. *Fields* v. *Willis,* supra. In *McClain* v. *Georgian Co.,* 17 *Ga. App.* 648 (87 S. E. 1090), Judge Russell, speaking for the court, said: "An insurer of the debt is a surety; a guarantor is an insurer of the solvency of the principal debtor or of his ability to pay." In *Manry* v. *Waxelbaum Co.,* supra, a rule for distinguishing contracts of suretyship and guaranty is stated thus: "The surety says to the creditor, if your debtor will not pay, I will pay. The guarantor says to him, proceed first against the principal, and if he should not be able to pay, then you may proceed against me. It has been said that there is no instance in the books of a guarantor contracting jointly with his principal. Much has been written upon this subject, but we think the above expresses the true distinction between the two classes of contracts." Measured by these rules, we think it is clear that each of the contracts in this case is one of suretyship; and that part of the demurrer, based on the contention that they were guarantors, was properly overruled.

The defendants contend that the contract signed by Forbes and Cato, executed January 31, 1931, released Davis and Overstreet on their contract executed September 30, 1929; that the second contract deprived them of certain rights which they had under the first contract. "For instance, they could have demanded that the

obligee bring suit against Williams. Such an action would have failed because the plaintiff had made a new contract with Williams, having a new maturity date, and the latter could have pleaded it. Certainly, if the principal, Williams, could set up the new agreement to defeat such action, Overstreet and Davis can. Likewise, the latter are placed in such position, they have no way to protect themselves other than to rely on sections 103-202 and 103-203 of the Code," which are as follows: "Any change in the nature or terms of a contract is called a novation; such novation, without the consent of the surety, discharges him. Any act of the creditor, either before or after judgment against the principal, which injures the surety or increases his risk, or exposes him to greater liability, shall discharge him; a mere failure by the creditor to sue as soon as the law allows, or neglect to prosecute with vigor his legal remedies, unless for a consideration, shall not release the surety." We recognize the rule that the undertaking of the surety being *stricti juris,* he can not, either in law or equity, be bound further or otherwise than he is by the very terms of his contract. *Bethune* v. *Dozier,* 10 *Ga.* 235; Stearns on the Law of Suretyship (4th ed.), p. 100. The second contract was not a novation of the first contract within the meaning of the Code, § 103-202. The second contract was not inconsistent with the first, and did not increase the risk of the sureties so as to release them under the provision of section 103-203 of the Code. The second contract simply amounted to giving the seller additional security for the payment of the debt. As to the maturity date for the payment of the goods and merchandise sold under the first contract, if any part of the account arising under the first contract was due and the maturity date for its payment had arrived before the execution of the second contract, the seller could have sued immediately after the execution of the second contract in like manner as he could have sued immediately before its execution. Thus we think that the second contract did not postpone the due date of any of the articles sold under the first contract. In the present suit the plaintiff was seeking to enforce payment for merchandise for which the sureties under the first contract were obligated to pay. The plaintiff was not seeking to bind the sureties on any obligation arising under the second contract, while the sureties in the second contract also obligated themselves to pay for the goods obtained

under the first contract by the same buyer. There was no extension of time granted for the payment of the goods obtained under the first contract—the purchaser merely obtained more sureties for the goods obtained under the first contract irrespective of what might transpire under the second contract.

(c) The defendant contends that a "suit upon a written contract, as set out in the petition, securing an open account itemized therein, is not amendable by alleging an account stated between the seller and purchaser." A party may always join with an account stated *a count* for the original debt, and if he fails on the one he might recover on the other. Goings *v*. Patten, 17 Abbott (N. Y. P. R.) 339, 341. The court here did not err in allowing the amendment over the sole objection that the amendment set out a new and distinct cause of action. *Sinclair Refining Co.* v. *Scott*, 60 *Ga. App.* 76 (2 S. E. 2d, 755).

■ The plaintiff in the main bill contends that the court erred in ruling out its books of account and twenty-eight letters which bore the name of the buyer and were received in due course of mail by the seller. The defendants contend that the plaintiff sought to prove an open account by hearsay evidence, and that such evidence was properly excluded. They further contend that the written evidence introduced in an attempt to prove an account stated was mere written hearsay for the reason that there was no proof that the debtor or customer executed it, i. e., that it was his signature to the writing which acknowledged the account and promised to pay it. On the question of proving the account the plaintiff tendered in evidence its "shop book" which was excluded; and also tendered in evidence twenty-eight letters which were also excluded. These letters contained orders for articles of merchandise, and acknowledged the receipt, delivery, and correctness of the charges of previous articles of merchandise involved in the account sued on. The letters bore the name of the buyer, and were received in due course of mail by the seller, most of them being in response to letters written by the seller (the plaintiff).

These "shop books" and the letters which contained the written orders acknowledged the receipt of the goods ordered and the correctness of charges previously made in the account sued on, and were excluded from evidence on the ground that they were hearsay—that the witness testifying had never seen the debtor write

his name or heard him acknowledge his signature. In 1 Green-leaf on Evidence (15th ed.), pp. 721-723, it is said: "There are *two modes of acquiring this knowledge* of the handwriting of another, either of which is universally admitted to be sufficient, to enable a witness to testify to its genuineness. The *first* is from *having seen him write.* It is held sufficient for this purpose, that the witness has seen him write but once, and then only his name. The proof in such case may be very light; but the jury will be permitted to weigh it. (a) The *second* mode is, from *having seen letters,* bills, or other documents, purporting to be the hand-writing of the party, and having afterwards *personally communicated* with him respecting them; (b) or *acted upon them* as his, the party having known and acquiesced in such acts, founded upon the supposed genuineness; or, by such *adoption* of them into the *ordinary business transactions* of life, as induces a reasonable presumption of their being his own writings; evidence of the identity of the party being of course added *aliunde,* if the witness be not personally acquainted with him. (c) In both these cases, the witness acquires his knowledge by his own observation of facts, occurring under his own eye, and, which is especially to be remarked, without having regard to any particular person, case, or document." In *Pearson* v. *McDaniel,* 62 *Ga.* 101 (supra), "Mc-Daniel sued out an attachment against Pearson & Co. for the purchase-money of eggs shipped by him to them at New York. On the trial the condition of the eggs was a disputed question. Plaintiff tendered in evidence a letter from defendants acknowledging the receipt of the eggs in apparent good order; the basis of its admission was plaintiff's evidence that he never saw defendants sign their names, or heard them acknowledge this signature, but that he was acquainted with their handwriting from previous business correspondence with them, and from this knowledge the letter was in their handwriting. It was admitted, and this was the main ground of exception." Our Supreme Court said: "It is said that the letters were improperly admitted. We think not. Proof was made that from correspondence with the firm the witness was acquainted with the handwriting, and that the letters were theirs, received by due course of mail. This was enough to admit them;" and stated the rule as follows: "Where a witness testifies that from business correspondence he is acquainted

with the handwriting of the writer of a letter received by due course of mail, such testimony is enough to carry the letter to the jury as evidence, and the court was right to admit it." H. P. Ousley testified that he was vice-president and general sales manager of the W. T. Rawleigh Company, had been vice-president in charge of sales for the past fourteen years, but had been with the company for over twenty-five years as sales director and sales manager; that his duties, among other things, were to have general charge of the sales of the company to its customers, see that their contracts were investigated and properly approved, to supervise the sales the company makes to its customers, and see that shipments of merchandise ordered were promptly made and the account given proper credits; and that he was acquainted with the handwriting of the customer. This testimony was sufficient, in the instant case, to carry the letters to the jury in order that they might determine the question as to whether the signature to the letters was that of the buyer in question.

The books of the plaintiff, which were ruled out of the evidence, contained the account of the customer in question and should have been admitted on behalf of the plaintiff, there having been proof that the books tendered were books of original entry by the persons whose duty it was to record, and who did record, the entries therein in the regular course of business. The auditor of the company testified in effect, that he inspected the books, and that they were regularly and properly kept in the course of business, and that there was no appearance on the face of the account, as kept in the books, which would make them incompetent. And, if the twenty-eight letters, with their accompanying and attached admissions, which were a part of the letters, had not been excluded from the evidence when tendered, the jury would have. been authorized to find that the customer had acknowledged or admitted that his account was correctly kept in the books of the plaintiff; and if the jury found that these letters with their admissions of the correctness of the items of the account were signed by the buyer, this would have been, at least, the equivalent of proving, in so far as the buyer in this case was concerned, that the plaintiff, the seller, kept correct books, and that they were free from the suspicion of fraud. *Crump* v. *Bank of Toccoa,* 41 *Ga. App.* 505, 506 (supra); *Taylor* v. *Tucker,* 1 *Ga.* 231, 234 (4). In *Crump*

v. *Bank of Toccoa,* Judge Bell said: "What was introduced was not really a book in the ordinary sense, but consisted of detachable sheets taken from a 'loose-leaf ledger' and contained a record of the account between the parties. These documents, however, will be treated as a book, and, for convenience herein, will be called a book, since such leaves or sheets may be removed from the ledger containing them and introduced in evidence upon the same footing and under the same principles as are applicable to the introduction of books of account, where the proper foundation of such evidence is otherwise laid. It is immaterial whether the original entries of the account be made in a book or on separate sheets of paper, the requirement as to this matter being that the document shall comprise an account of the dealings between the parties and shall be primary and original." This language is applicable to the facts in the instant case, and the court erred in not allowing these books to be introduced in evidence. The ledger sheets here are books of original entry, and were admissible in evidence as the books of original entry. It was also permissible for the plaintiff to introduce in evidence, over the objection that they were hearsay, the letters containing the original orders signed by the customer, and the acknowledgment of the delivery of the articles previously ordered, by acknowledging that these articles were correctly charged in the account rendered, which account rendered corresponded with the ledger sheets tendered in evidence and with the account now sued on. The exclusion of the letters was harmful error.

The court admitted in evidence letters, or parts thereof, which stated: "Notice: If the above balance is correct, please sign the following account stated and return immediately. If not correct, furnish us a statement of your debits and credits and point out claimed errors if any: Account Stated. Dated January 20, 1931. The W. T. Rawleigh Company, dear Sirs: I have examined the December statement of account and find the balance of $774.80 to be the correct balance due the company at the close of business Dec. 31, 1930, which balance I agree to pay according to the terms of my contract. H. S. Williams."

The defendants contended that the signature to these letters or documents, which purported to be accounts stated, was never proved to have been the signature of the buyer, and now claims that these documents, although tendered in evidence, are but

written hearsay, and that hearsay evidence has no probative value, whether introduced with or without objection, and that thus there was no legal evidence which would here support a finding that there was an account stated. We think the tendered evidence which should have been allowed was sufficient to carry to the jury the question as to whether the customer (buyer) signed the documents.

A party may fail to establish an account stated, but that does not cut him off from establishing an unsettled or open account. The account stated does not alter the nature of the debt, it only reduces it to a certainty. A party may always join with an account stated *a count* for the original debt, and, if he failed upon one, he might recover upon the other. Here the original petition merely sued on an account and attached thereto an itemized statement of the account as a part thereof. Thereafter, without striking any part of the open-account feature of the petition, the defendant amended its petition and sought a recovery also upon an account stated. No objection was made to the form of the amendment and the court did not err in allowing it over the sole objection that the amendment set out a new and distinct form of action. In this state of the pleading the petition entitled the plaintiff to prove an account stated, i. e., that there was an agreement between the seller and the buyer who had had previous transactions fixing the amount due in respect to such transactions and promising payment, or failing in that, to show an unsettled or open account and an indebtedness to the plaintiff. *Ward* v. *Stewart,* 103 *Ga.* 260, 262 (29 S. E. 872). It would have been entirely consistent with the plaintiff's claim of an account stated for the plaintiff to have furnished a copy of the account upon which it meant to rely in the event of failure to prove the account stated. Goings *v.* Patten, supra. In the instant case such a copy had been furnished the defendants by serving them with a copy of the original petition to which was attached an itemized statement of the open account as a part thereof. Thus the plaintiff pleaded both forms of indebtedness, and the defendants being thus notified were bound to come prepared upon the trial to dispute both the account stated and the unsettled or open account. Johnson *v.* Tyng, 1 App. Div. 610 (37 N. Y. Supp. 610). In the present state of the pleadings and with the account book and letters, which were

improperly excluded, in evidence, if the jury should determine under the above rules that the letters and documents, which were a part thereof, were signed by the buyer, one phase of the evidence would authorize a verdict in favor of the plaintiff on the theory that the open account had been proved. The court having committed harmful error in excluding the "shop book" and the letters or documents in question, the case must be returned for another trial.

■ There are other questions in the record but the foregoing rulings are upon the controlling questions in the case, and, under these rulings, a new trial must be granted.

*Judgment reversed on the main bill of exceptions; and judgments on the cross-bills affirmed. Broyles, C. J., and Gardner, J., concur.*